**CLOSED**

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD ROE, : | |
| : | Civil Action No. 05-1243 (SRC) |
| Plaintiff, : | |
| : | OPINION |
| v. : | |
| : | |
| NEW JERSEY STATE POLICE, et al., : | |
| : | |
| Defendants. : | |

**CHESLER**, District Judge

This matter comes before the Court upon the Motion for Summary Judgment filed by Defendants New Jersey State Police, Glen Talavera and Keith Bevacqui (docket item # 23).[1] The Court held oral argument on the motion on September 5, 2007. It has also considered the written submissions by the parties in connection with this motion. For the reasons discussed below, this Court grants Defendants' motion for summary judgment as to Plaintiff's claims under 42 U.S.C. § 1983 and remands the remainder of the action.

---

[1] Although Michael Clifford is also named as a movant and continues to appear on the docket as an active defendant, the Court notes that Plaintiff voluntarily dismissed his claims against Clifford with prejudice on or about December 13, 2004, before this case was removed to federal court.

I.      **FACTUAL BACKGROUND**

In this civil rights action, Plaintiff Richard Roe seeks relief from the New Jersey State Police and two state troopers for injuries he sustained on May 23, 2002 when he was shot over 20 times by a member of a street gang to which Plaintiff belonged. The action arises out of events that occurred on May 22 and 23, 2002. The facts relevant to this motion are as follows.

On May 22, 2002, Plaintiff was arrested by New Jersey State Police officers pursuant to an outstanding warrant accusing him of stealing cars and selling them in or about December 2001. At the time of his arrest, Plaintiff was a member of a gang known as the "Almighty Latin Kings and Queens Nation" (hereinafter, the "Latin Kings"). State troopers Talavera and Bevacqui interrogated Plaintiff at the State Police Facility in Newark. According to Plaintiff, the troopers threatened him physically and verbally for hours in an attempt to coerce him into becoming an informant for the police. At his deposition, Plaintiff testified that he was told if he did not cooperate, bail would be set at an exorbitant amount, he would be charged with selling guns and many other crimes and that Plaintiff would sit in jail "forever." He also testified that he was beaten by the officers and that he ultimately agreed to become an informant so that he could be released from custody, even though he had no intention of actually performing as an informant once released.[2]

Following the interrogation, Talavera and Bevacqui transported Plaintiff to the Essex

---

[2] The Court relates these facts for purposes of completeness. However, even though Plaintiff provides these details concerning the manner in which he was interrogated and the circumstances under which he agreed to become an informant, he does not base any of his claims for violation of his constitutional and state law rights on the coercion he claims he experienced. The claims set forth in the Amended Complaint and the arguments made to the Court in briefing and at oral argument focus only on the Defendants' alleged failure to protect Plaintiff in accordance with his due process rights.

County Courthouse in Newark for arraignment. Plaintiff claims that he was scared of being recognized during the transport by people he knew and worried that they might alert the gang members that Plaintiff may be cooperating with the police. It is undisputed that the officers brought Plaintiff into the courthouse through its front entrance. Although the officers attempted to bring Plaintiff in through a back entrance, they were not permitted to enter through that door. Defendants walked him along the exterior of the building to reach the front entrance. Plaintiff testified that, once inside the courthouse, one of the people he saw at the security checkpoint in the courthouse was "Chino's cousin," meaning the cousin of the gang member who shot Plaintiff on May 23. According to Plaintiff, Chino's cousin was coming out of the elevator as Plaintiff and the trooper Defendants were entering it. It is not clear who Chino's cousin is, and what he may have been doing in the courthouse on that day. The troopers recount that they chose a route meant to shield Plaintiff from the public as much as possible, including taking him up to the courtroom on an elevator which was not accessible by the public and which opened to a private area on each floor where judges' chambers are located.

Upon the request of the defendant police officers, Plaintiff was released on his own recognizance. Although Plaintiff's bail was to be set at $250,000, Bevacqui told the judge in an in camera conversation that Plaintiff had agreed to act as an informant for the police and that his release was essential to the police operation. Before his release, Plaintiff was given contact information for Talavera and Bevacqui, including cell phone and pager numbers. When Plaintiff left the courthouse later that day, he called Bevacqui to tell him that he had been released. He also states that he met in person with Talavera and Bevacqui, who instructed him to obtain information on the Latin Kings. Plaintiff testified that he believed that upon his release, he

would have 24-hour surveillance by the police because "that's what they [Talavera and Bevacqui] told me."

At some time on May 22, 2002, following his release from prison, Plaintiff received a telephone call from a man named Juan, a member of the Latin Kings, who asked to meet with Plaintiff the next day, presumably about purchasing a car. Juan called Plaintiff again at or about 11 in the morning of the 23rd. Plaintiff claims that he tried to contact Defendants to inform them of the meeting but was not able to reach them. He does admit, however, that even though he spoke with Bevacqui on May 22, he did not mention the meeting with Juan. He also acknowledges that, while he made several phone calls to his parole officer after Juan's call on May 23, to tell her he felt he was in danger, Plaintiff waited until 1 p.m. to place a call to the state police phone number with which he was provided.

On the afternoon of the 23rd, Juan and three other Latin Kings members known as "Chino", "Petie", and "Japhet" met Plaintiff at or near his residence. According to Plaintiff, they forced Plaintiff into the backseat of his car and took him against his will to New York. Chino, the driver, pulled the car over at some unknown location in Manhattan, where he and all the passengers except for Plaintiff exited the vehicle. According to Plaintiff's deposition testimony and statement to the police, Chino then began shooting Plaintiff while he was still in the backseat. At oral argument, his counsel described the shooting as having occurred after Plaintiff was forced to exit the vehicle and then placed in the car's open trunk. In total, Plaintiff was shot 23 times and left by the others for dead. As a result of the shooting, Plaintiff sustained severe injuries, including paralysis and loss of the use of his bowels. The four Latin Kings who abducted Plaintiff on May 23, 2002 were indicted in the State of New Jersey on various charges,

including kidnapping, assault, and tampering with a witness or informant.

The parties contest the motivation behind the shooting. Plaintiff claims that the Latin Kings learned that he was acting as an informant for the police and tried to kill him in retaliation. In his statement to New Jersey State Police Detective Michael Clifford, he stated that when the Latin Kings members kidnapped him on the day of the shooting, they said "we don't want no cars, we came for you, you fuckin' snitch." Defendants, on the other hand, point out that per the Plaintiff's own admission to Detective Clifford, Plaintiff also stated that he believes that his shooting was ordered by Adam Roman, another member of the Latin Kings, because Plaintiff had witnessed Roman threaten to kill Maria Correia, who had allegedly been involved with Plaintiff in the sale of stolen cars, and because Plaintiff had left the Latin Kings gang. Plaintiff added, in his statement to Detective Clifford, that he also felt that Roman was behind the kidnapping and shooting because on several occasions he sent Japhet and another Latin Kings member to ask Plaintiff if he had "been mouthing off about Adam" and if he had "been talking to that bitch Maria." Defendants also point out that Plaintiff held Roman's position of First Crown (second in command) in the gang while Roman was incarcerated. According to Plaintiff, it is true that he and Roman did not get along, at least in part because both of them had been involved in relationships with the same woman. Plaintiff also testified in his deposition that he had in fact warned Maria Correia to leave town because Roman was planning on killing her over money she owed him, though he added that he was certain that neither Roman nor any other Latin King ever found out that he had given Maria this warning.

On or about April 27, 2004, Plaintiff filed a Complaint in the Superior Court of New Jersey, Law Division, Essex County. The Complaint asserts claims under 42 U.S.C. § 1983

based on Defendants' alleged failure to protect Plaintiff in violation of his due process rights under the Fourteenth Amendment. The Complaint also asserts a claim under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, et seq., based on the same alleged misconduct, though the contours of that claim are not clear from the Complaint or from the motion papers. Plaintiff amended the Complaint in or about February 2005 to add Keith Bevacqui as a defendant. Defendants removed the case to this Court on March 4, 2005.

II. DISCUSSION

Defendants seek summary judgment on the entirety of Plaintiff's Amended Complaint. The thrust of Defendants' motion is that Plaintiff cannot establish a prima facie case of unconstitutional failure to protect against State Troopers Talavera and Bevacqui in their individual capacities. They also seek an order from the Court dismissing with prejudice Plaintiff's section 1983 claims against Defendant New Jersey State Police and Talavera and Bevacqui, to the extent they have been sued in their official capacities, as barred by the Eleventh Amendment. Finally, Defendants ask for dismissal of the New Jersey Tort Claims Act claim based on the defense of good faith immunity.

A. **Summary Judgment Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co.,

223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48. Pursuant to Federal Rule of Civil Procedure 56(e), the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), cert. denied, 507 U.S. 912 (1993)).

      B.      **Section 1983 Claims Against Talavera and Bevacqui In Their Individual Capacities**

The Amended Complaint alleges that Defendants breached their duty to "supervise and monitor plaintiff so as to ensure his safety in a circumstance, which they knew, was life threatening to plaintiff." It further alleges that this failure to protect Plaintiff shocks the conscience and thus violated Plaintiff's substantive due process rights. Plaintiff avers that his

7

shooting injuries resulted from Defendant's unconstitutional conduct and therefore seeks recovery against them pursuant to 42 U.S.C. § 1983.

Section 1983 provides a cause of action for constitutional violations committed by persons acting under color of state law. 42 U.S.C. § 1983; Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Plaintiff alleges that Defendants' failure to protect him from the violence inflicted on him by Chino and the other Latin Kings members who kidnapped him violated his Fourteenth Amendment rights. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV.

The Due Process Clause does not generally guarantee that the State will protect its citizens against violence committed not by the State but by private parties. DeShaney v. Winnebago County Dep't of Social Svcs., 489 U.S. 189, 196-97 (1989). "Although the liberty protected by the Due Process Clause affords protection against unwarranted *government* interference . . ., it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." Id. at 196 (quoting Harris v. McRae, 448 U.S. 297, 317-18) (emphasis in quotation). DeShaney, however, did recognize that the State may have an affirmative duty to protect under the Fourteenth Amendment in two limited circumstances. Id. at 199-200. The duty to protect may arise "when the State, by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." Id. at 200. In other words, when the State takes a person into custody, the Constitution imposes upon the State the responsibility of his or her safety. Id. at 199-200. This circumstance is known as the "special

relationship" exception to the general rule that there is no duty on the State to protect against third-party violence. The other exception to the rule is known as the "state-created danger" exception. In this circumstance, the Due Process Clause imposes a duty to protect on the State when "state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'" Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (quoting Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003)).

The special relationship exception is not implicated in this case. Plaintiff does not dispute that he was not in custody, and that his liberty was not otherwise restrained by the State, at the time of the kidnapping and shooting. Because the State's duty to protect based upon a special relationship is triggered by the State's restraint of an individual's freedom of movement and the individual's inability to protect himself in that situation, it follows that no special relationship between Plaintiff and the State existed during the time period relevant to Plaintiff's failure to protect claim. The assault on Plaintiff occurred on May 23, 2002, well after Plaintiff was released from police custody following his arrest on the previous day. Plaintiff's agreement to cooperate with the State as an informant did not give rise to a special relationship, within the meaning of DeShaney, notwithstanding the holding of G-69 v. Degnan, 745 F.Supp. 254 (D.N.J. 1990). This Court understands the conclusion in G-69 that the informants in that case were in a special relationship with the State to have been predicated on the fact that the informants, G-69 and his wife, served in an undercover role and then, when that was compromised, were forced to remain in their homes at the direction of the State for months. G-69 v. Degnan, 745 F.Supp.254, 256-57 (D.N.J. 1990); see also Cherry v. City of Philadelphia, No. 04-1393, 2004 WL 2600684,

9

at *4 (E.D. Pa. Nov. 15, 2004) (distinguishing G-69, because plaintiff in Cherry was not in police custody or otherwise restrained when she was shot by third party).

The Court, then, turns its analysis to the state-created danger exception. To establish a prima facie case of a Fourteenth Amendment violation on this failure to protect theory, a plaintiff bears the burden of proving the following four elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable member of the defendant's acts or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Bright, 443 F.3d at 281 (internal quotations and citations omitted).

Beginning the analysis with the fourth and final element, the Court notes that Plaintiff contends that the affirmative act committed by Defendants, which created "an opportunity for danger that otherwise would not have existed," Rivas v. City of Passaic, 365 F.3d 181, 195 (3d Cir. 2004), was the Defendants' processing of Plaintiff at the time of his arrest.[3] Plaintiff argues that Plaintiff was exposed through his arraignment at the Essex County Courthouse. He contends

---

[3] At oral argument, Plaintiff conceded that he does not contend that the state-created danger stems from the officers' alleged, and disputed, promise to provide Plaintiff with 24 hour surveillance upon his release from custody on May 22, 2002. His counsel represented to the Court that Plaintiff does not, in fact, base any claim asserted in this lawsuit on this alleged promise made by the police.

that the officers were aware that Newark, the location of the courthouse, is a foothold of the Latin Kings gang and that, at any given time, Latin Kings gang members will be incarcerated in the courthouse's jail annex.  In fact, Plaintiff notes, Adam Roman, the Latin Kings First Crown with whom Plaintiff had a contentious relationship, was incarcerated in the Essex County Jail at the time.  Plaintiff points to several actions taken by the troopers that, in Plaintiff's opinion, would have signaled to any observer that Plaintiff was cooperating with the police as an informant: the troopers' deciding to bring the Plaintiff into the Courthouse through the front entrance, bringing him into the courthouse and courtroom visibly handcuffed, and ultimately having him released on his own recognizance even though Plaintiff initially faced bail of $250,000.  Plaintiff further argues that the troopers themselves acknowledged, in their deposition testimony, that their actions could have alerted others of the possibility of Plaintiff's cooperation and that information travels quickly through the courthouse and jail.

 Plaintiff appears to have proffered sufficient evidence in support of the third and fourth elements of the state-created danger theory of liability to withstand Defendant's motion for summary judgment.  As to the first element, which goes to causal connection between the injury and the danger created by the officers, the evidence is by no means conclusive.  Plaintiff does not proffer any evidence demonstrating that someone actually did recognize him in the courthouse on May 22, 2002, learn that he had agreed to act as an informant or tell a member of the Latin Kings or anyone else that Plaintiff had been spotted in the courthouse that day.  He also proffers no evidence that he communicated or set up the meeting with Juan pursuant to an instruction of Defendants, and in fact, the record shows that he pursued the meeting without consulting Defendants for their advice or assurance of protection.  The Court, however, does find that the

record presents a contested issue of fact with regard to whether Plaintiff was victimized because, through Defendant's actions, the assailants learned that he was an informant. Plaintiff's testimony about being called a "snitch", together with the timing of the shooting occurring on the day after his arrest and the State's own indictment of the assailants for tampering with an informant prevent the Court from concluding that no proximate cause can be established as a matter of law. Exxon Co., USA v. Sofec, Inc., 517 U.S. 830, 840-41 (1996) (citing Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U.S. 469, 473-76 (1877)); Rodriguez v. Fajardo, No. 06-4996, 2007 WL 1959254, *5 (D.N.J. July 3, 2007).

The fundamental flaw with Plaintiff's case, however, is his lack of evidence that the officers engaged in any danger-creating conduct that "shocks the conscience." To constitute a substantive due process violation, the State actor's conduct must rise to a greater level of culpability than mere negligence. County of Sacramento v. Lewis, 523 U.S. 833, 846, 848-49 (1998); Schieber, 320 F.3d at 419. The standard for culpability for a substantive due process violation will vary according to the urgency of the situation, with a more pressured situation requiring that an officer acted with intent to harm or conscious disregard for the safety of a person while a situation allowing for more deliberate thought must at least demonstrate gross negligence by the officer. Ye v. United States, 484 F.3d 634, 639 n. 2 (3d Cir. 2007); Rivas, 365 F.3d at 195-96. Third Circuit jurisprudence directs that "the required culpability must be somewhere within the bounds of gross negligence, at a minimum, and gross recklessness, at a maximum." Ye, 484 F.3d at 639 n.2. Plaintiff's arrest and processing occurred approximately five months after the crime for which he was charged, a situation which the Court concludes falls on the lower end of the scale of required mens rea to shock the conscience. Nevertheless, the

record in this case does not, and cannot as a matter of law, support that conclusion that Bevacqui and Talavera acted with gross negligence in the way they had Plaintiff arraigned and released to act as an informant.

Even crediting Plaintiff's argument that the troopers could have processed Plaintiff in a safer, more secretive fashion - e.g., as Plaintiff suggests, having him arraigned in one of New Jersey's more rural counties where the Latin Kings are not as prevalent as Newark - the Court finds that none of the "signaling" behavior in which the troopers engaged before, during and after the arraignment on May 22, 2002 could constitute gross negligence on their part.  In fact, the record demonstrates that the officers took precautions to keep Plaintiff's cooperation with them confidential.  The officers first attempted to bring Plaintiff into the courthouse through a back entrance and only went to the front entrance after being denied admission in the back.  They asked for Plaintiff to be released on his own recognizance, instead of $250,000 bail, in the privacy of the judge's chambers.  It was only here, shielded from the public, that they explained to the judge that this was necessary so that Plaintiff could get back on the streets to serve as a police informant.  Plaintiff accepted this term of release.  The judge suggested that Plaintiff's arraignment be conducted after all other pending matters had been handled and cleared from the courtroom.  Indeed, Plaintiff proffers no evidence that anyone witnessed the judge's order that Plaintiff be released on his own recognizance, much less someone connected to the Latin Kings. There is no evidence in the record that the troopers deliberately or with gross negligence exposed Plaintiff as an informant, and the mere fact of Plaintiff's arrest, though characterized by Plaintiff as essentially parading him through the courthouse in handcuffs, does not signal cooperation with the police.  In short, there is no genuine issue of fact as to the lack of conscience-shocking

13

behavior by the defendant police officers in this case.

     Plaintiff's emphasis, at oral argument in particular, on the police officers' unavailability to speak with him before the meeting with Juan and the other Latin Kings does not, as a matter of law, carry his burden of establishing the state-created danger factors articulated in <u>Bright</u>. Plaintiff claims that on the evening of May 22 and early in the afternoon on May 23 he tried repeatedly to contact the officers using the phone numbers he was provided, but that his calls were not answered or returned before the meeting with the Latin Kings members on May 23. The suggestion that a causal link between the officers' conduct and the shooting could be drawn based finds no evidentiary support. The first prong of the <u>Bright</u> test requires that the harm have been a "foreseeable and fairly direct" result of the alleged misconduct. Plaintiff cannot establish that causal connection in this case. There is no basis upon which to conclude that Plaintiff was abducted and shot as a fairly direct result of the officers' failure to answer Plaintiff's phone calls. Note that in this case, Plaintiff was not acting in an undercover role at the direction of the police. Rather, he had merely agreed to serve as an informant, meaning he would pass on to the police information he gathered about the Latin Kings as he went about his normal, daily affairs, such as agreeing to meet with someone to sell a car. Moreover, even assuming, arguendo, that causation were a debatable point, no reasonable juror could find that the officers' failure to be available to Plaintiff on demand amounts to conscience-shocking conduct. Indeed, Plaintiff had spoken to the officers the day before the meeting with Juan and and the others and admits that he did not mention Juan's proposal that they meet the following day.

Because Plaintiff cannot, as a matter of law, prove the second element of the state-created danger theory of an unconstitutional failure to protect, his section 1983 claims seeking redress of this alleged due process violation must be dismissed on this motion for summary judgment.

### C.     Section 1983 Claims Against The New Jersey State Police and Troopers Talavera and Bevacqui In Their Official Capacities

Defendants move for the dismissal of the section 1983 claims against Defendant New Jersey State Police, and that motion must be granted.  A "State is not a person within the meaning of [42 U.S.C.] § 1983."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989).  As a subdivision of the state government, the New Jersey State Police is similarly immune from suit under section 1983 by virtue of the immunity conferred upon States by the Eleventh Amendment.  Id. at 70; Fitchik v. N.J. Transit Rail Operations, 873 F.2d 655, 658-59 (3d Cir. 1989); Longoria v. State of N.J., 168 F.Supp.2d 308, 315-16 (D.N.J. 2001).

Defendants also argue that Talavera and Bevacqui are immune from suit in their official capacities.  They are correct.  Plaintiff does not seek prospective injunctive relief against the troopers, but rather money damages only.  "Neither a state nor state officials sued in their official capacities for money damages are 'persons' under section 1983."  Melo v. Hafer, 912 F.2d 628, 634 (3d Cir. 1990); see also Will, 491 U.S. at 71 (holding that a suit against state official in his official capacity is a suit against the official's office and therefore no different than a suit against the State itself). The Complaint does not specify whether the individual officers are sued in their individual or official capacities, but reading the Complaint in the non-movant's favor, the Court treated the claims as having been brought against them individually and analyzed the sufficiency of Plaintiff's case accordingly in Section B, above.  To the extent the Complaint can be read to

assert section 1983 claims against Talavera and Bevacqui in their official capacities, those claims must be dismissed.

### D. Remand Of Remaining State Law Claims

Defendants' motion also seeks summary judgment on the claims for relief brought against them pursuant to the New Jersey Tort Claims Act, arguing that they are entitled to good faith immunity under that statute. The Court declines to decide this portion of the motion. Instead, the Court finds that the case should be remanded to state court for adjudication of the state-law issues.

As the Court will dismiss all of Plaintiff's federal claims, it exercises its discretion not to retain supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . [once] the district court has dismissed all claims over which it has original jurisdiction"). The Third Circuit has explained that "once all federal claims have been dropped from a case, the case simply does not belong in federal court." New Rock Asset Partners, L.P. v. Preferred Entity Advancements, 101 F.3d 1492, 1504 (3d Cir. 1996) (quoting Lovell Mfg. v. Export-Import Bank, 843 F.2d 725, 734 (3d Cir. 1988)). Nor are there any circumstances present which would make the exercise of the Court's discretion to retain supplemental jurisdiction appropriate. See United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966).

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on Plaintiff's claims under 42 U.S.C. § 1983. The section 1983 claims are dismissed with prejudice,

and the remainder of the action will be remanded to the Superior Court of New Jersey, Law Division, Essex County. An appropriate form of order will be filed together with this Opinion.

      s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

DATED: September 21, 2007